IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MORGAN KUKOVEC**, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> v. <br><br> **L'ORÉAL USA PRODUCTS, INC. D/B/A L'ORÉAL PARIS**, <br><br> Defendant. | Case No. 1:22-cv-03829 <br><br> Hon. Martha M. Pacold, *Presiding Judge* <br> Hon. Jeffrey T. Gilbert, *Magistrate Judge* <br><br> Plaintiff's Opposition to Defendant's Motion to Dismiss Complaint |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS COMPLAINT**

Plaintiff, Morgan Kukovec ("Ms. Kukovec" or "Plaintiff"), by and through her undersigned counsel, hereby submits her Response to Defendant's Motion to Dismiss Plaintiff's Complaint, and in doing so, states as follows:

**INTRODUCTION**

Ms. Kukovec brings this action on behalf of herself and other similarly situated individuals seeking relief based on Defendant's clandestine collection, storage, and use of Plaintiff's and the proposed class members' biometric information through L'Oreal's "Virtual Try-On" ("VTO") tool. In her Class Action Complaint (Dkt. 1), Plaintiff alleges that, while visiting one of L'Oreal's websites, she used a VTO tool to see how a particular shade of lipstick would look on her. Unbeknownst to her at the time, L'Oreal captured her facial geometry and did so without her knowledge or consent, in violation of the Illinois Biometric Privacy Act ("BIPA"). Defendant has moved to dismiss Plaintiff's complaint, making three primary arguments, none of which can succeed:

First, Defendant argues that Plaintiff's claims are subject to arbitration. This argument must fail because Defendant buried its terms behind a link at the bottom of its cluttered site, and Plaintiff did not have reasonable notice of them. Courts do not enforce such purported "agreements."

Second, Plaintiff's detailed pleadings plausibly allege that L'Oreal captured, collected, and possessed her biometric information when she used the VTO tool that made a scan of her facial geometry. Defendant's protests to the contrary are unavailaing.

Finally, Defendant cannot shoehorn its generic privacy policy into the stringent requirements that BIPA imposes to safeguard sensitive biometric information. Its policy plainly does not meet BIPA's requirements.

For these reasons, as discusussed below, the Court should deny Defendant's motion in full.

## BACKGROUND

### A. The Illinois Biometric Information Privacy Act protects sensitive personal information including facial geometry.

Plaintiff brings claims under Sections 15(a) and 15(b) of BIPA. Section 15(a) provides that any private entity "in possession" of biometric information must "develop a written policy, made available to the public" that "establish[es] a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied." 740 ILCS 14/15(a). It further requires that a private company adhere to its own established retention schedule and destruction guidelines absent a valid warrant or subpoena. *Id.* BIPA expressly defines the term "biometric identifier" to include a "scan of . . . face geometry." *Id.* § 14/10.

Section 15(b) prohibits any company from even "collect[ing], captur[ing] . . . or otherwise obtain[ing]" a consumer's biometric information unless it first obtains the customer's written consent. *Id.* § 14/15(b). Specifically, the company must (1) provide written notice that their "biometric information or biometric identifier is being collected or stored"; (2) provide written notice of "the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used"; and then (3) receive a written release executed by the consumer. *Id.* These

stringent requirements are in line with the Legislature's findings that "[t]he full ramifications of biometric technology are not fully known." *Id.* § 14/5(f).

### B. L'Oreal's Virtual Try-On tool created a facial roadmap of Plaintiff's face by capturing and collecting her facial geometry.[1]

L'Oreal, a large corporation that markets numerous beauty brands and products, operates a VTO technology on at least nine of its brands' websites, including www.lorealparisusa.com. (Dkt. 1, at ¶¶ 13-14.) Ms. Kukovec is a consumer who was shopping for lipstick when she visited the L'Oreal Paris website in December 2021. (*Id.* ¶ 27.) L'Oreal invited Ms. Kukovec, as it does all shoppers on its website, to access a VTO tool that allows the shopper to "virtually" test a particular product without visiting a store. (*See id.* ¶¶ 15, 27.) Defendant makes this invitation by way of a "Try It On" button that appears below the photo of the product the consumer is viewing on the site. (*Id.* ¶ 15.) When site visitors like Ms. Kukovec click "Try It On," a pop-up appears in which they can use their web or phone camera to display a real-time photo of their face or upload a photo previously saved to their device. (*Id.* ¶¶ 16, 32.) If a visitor clicks "Live Camera," the VTO tool activates their webcam automatically, so that their real-time image appears immediately. (*Id.* ¶ 17.) The technology projects how cosmetics will appear on the consumer's face by overlaying the selected product on the image provided. (*Id.* ¶¶ 16-19.)

The VTO technology works by capturing users' facial geometry to create a roadmap of their faces so that L'Oreal's products can be displayed on the image correctly. (*Id.* ¶¶ 19, 20.) The facial geometry scans produced by the tool are used to identify the shape and features of the user's face. (*Id.* ¶ 19.) The technology powering the VTO tool purports to use "highly accurate 3D facial micro-feature tracking" and offers "one of the most precise real-time facial micro-features video tracking and analysis technologies in the world." (*Id.* ¶ 19.) Defendant captured and collected Plaintiff's facial geometry in this manner when she used the VTO tool. (*Id.* ¶¶ 30-31.)

---

[1] The factual allegations in this section are taken from Plaintiff's Complaint, which the Court must take as true for the purposes of this motion. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).

### C. Defendant possesses, captures, and collects facial geometry in violation of BIPA's notice and consent provisions.

L'Oreal violates BIPA. Specifically, the Complaint alleges that Defendant does not comply with Section 15(b) because Defendant (1) does not inform consumers in writing that their biometrics are being collected or stored; (2) does not inform them of the specific purpose and length of term for which it collects, stores, or uses their biometrics; and (3) does not obtain a written release from them before collecting their biometrics. (*Id.* ¶ 21.) L'Oreal did not make these disclosures to Ms. Kukovec nor did it obtain a written release form her authorizing it to collect, store, or use her facial geometry. (*Id.* ¶¶ 22-23.) Defendant's generic references in its privacy policy to "[p]hotographs that you upload or share with us" do not discuss the company's capturing, collection, or use of biometrics at all. (*Id.* ¶¶ 22-23.)

The Complaint also alleges that L'Oreal violates Section 15(a) because it does not make publicly available its written policy (if it has one at all) establishing a retention schedule and guidelines for permanently destroying the consumer biometrics that it collects. (*Id.* ¶ 24.) Defendant has never made such a policy available to Ms. Kukovec. (*Id.* ¶¶ 34-35.) Defendant's privacy policy does not discuss the retention or destruction of any biometric information. (*Id.* ¶¶ 22.)

Ms. Kukovec therefore brings claims under BIPA for failure to provide the statutorily mandated safeguards for her sensitive biometric information. She brings these claims on her own behalf and on behalf of a putative class of Illinois consumers whose biometric identifiers were captured by Defendant through use of the VTO tool on its various websites. (*Id.* ¶ 36.)

## ARGUMENT

### A. This Court has jurisdiction over Plaintiff's claims.

#### 1. Plaintiff did not agree to arbitrate any disputes with Defendant.

"[A] party seeking to compel arbitration must establish the existence of a binding and enforceable arbitration agreement." *Melvin v. Big Data Arts, LLC*, 553 F. Supp. 3d 447, 449 (N.D. Ill. 2021) (citation omitted). No enforceable agreement exists here because Plaintiff never agreed to be

4

bound by a "browsewrap" agreement buried under a small hyperlink in tiny font at the very bottom of L'Oreal's website.

> a. **Plaintiff did not assent to Defendant's "browsewrap" terms just by visiting Defendant's website.**

Judicially noticeable evidence demonstrates the following:[2] The only way for a consumer to find the Terms of Use on Defendant's website is to scroll all the way down through several screens' worth of Defendant's colorful marketing content, all the way to the bottom of a webpage on Defendant's site. (See Exhibit A, attached.) There, the site contains a list of 18 links and, below that, in in the smallest font on the page, *another* list of six links. Second from the left is a small link titled "Terms and Conditions."



*Page from Defendant's website, scrolled all the way to the bottom (from Exhibit A, attached)*

This passive link is the only notice of any Terms of Use purportedly applicable to the L'Oreal site, including the arbitration provision Defendant now seeks to enforce.

---

[2] *See* Plaintiff's Request for Judicial Notice, filed concurrently.

Providing terms only accessible through a passive link is what is known as a "browsewrap" agreement, where "notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Hussein v. Coinabul, LLC*, No. 14 C 5735, 2014 WL 7261240, at *2 (N.D. Ill. Dec. 19, 2014) (quotation marks omitted). "In order for a browsewrap agreement to be enforced, the user must have had actual or constructive knowledge of the website's terms and conditions." *Id.* L'Oreal doesn't claim that Plaintiff had actual knowledge of the Terms of Use, so the only question is whether she had constructive notice. "Constructive notice depends on the design and content of the website itself," *id.*, and that design must "provide[] reasonable notice of the terms of the contract," *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 901 (S.D. Ill. 2012).

L'Oreal's choice to hide its arbitration provision in its Terms of Use, which are in turn hidden in a list of hyperlinks at the very bottom of its website, ensured that Plaintiff (or any other consumer) did not receive reasonable notice of those terms. "Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). This Court should likewise refuse to enforce the Terms and Conditions. *See Hussein*, 2014 WL 7261240, at *3 (terms "hidden behind a hyperlink" that was "tucked away at the bottom of [the] website" are unenforceable); *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 789 (N.D. Ill. 2011) (denying motion to compel arbitration where defendant failed to establish that plaintiffs "ever viewed the enrollment web pages containing the Terms and conditions upon which Defendants rely" or accepted those terms).[3]

---

[3] See *also Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *6 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016) (collecting cases and observing that "an increasing number of courts in both federal district and appellate levels require an explicit text informing users that they are giving their assents to agreements when they navigate websites"); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064-65 (D. Nev. 2012) (browsewrap agreement invalid).

Defendant makes the spurious assertion that New York law "favors enforcing hyperlinked agreements," citing to *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017). (Dkt. 18, at 15.[4]) This assertion is false and *Meyer* holds no such thing. In *Meyer*, the Second Circuit applied *California* law and determined that a consumer had reasonable notice of an arbitration clause where "the Payment Screen is uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account [or connect a pre-existing account], and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY.'" 868 F.3d at 78. That case is nothing like the browsewrap agreement presented here. Plaintiff did not create an account on Defendant's website. Defendant's website is anything but "uncluttered." And Defendant's site included no clear warning that, by using the site, she was agreeing to Defendant's terms. (*See* Ex. A.)

Similarly, in *Nichols v. Wayfair*, the court assessed an arbitration clause where the plaintiff had purchased furniture from the defendant's website. 410 F. Supp. 3d 448 (E.D.N.Y. 2019). There, the purchase button included a warning that "[b]y placing this order, you are agreeing to our <u>terms and conditions</u>" and the plaintiff *actually accessed* the linked terms and conditions. *Id.* at 451. This is nothing like the scenario here where Plaintiff never viewed the terms, she was not warned that any terms would apply, and she made no purchase on the site. The remainder of the cases that Defendant cites purportedly supporting the enforceablility of its browewrap agreement are similarly easily distinguishable. *See, e.g., Valelly v. Merril Lynch*, 464 F. Supp. 3d 634, 638-39 (process of opening financial account guided user through several pages of electronic disclosures); *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) (box to sign up for membership stated that consumer would be bound by the terms of membership, linked near the box). Defendant's arguments are without support.

---

[4] Citations to pages herein hrefer to the page numbers assigned by the Electronic Case Filing System.

b.      **Plaintiff did not assent to Defendant's terms by using the Virtual Try-On tool.**

Defendant also never presented Plaintiff with its Terms of Use before or during her use of the VTO tool. Before using the VTO tool, a user is presented with the following pop-up notification:



*Screenshot of Notification After Clicking "Virtual Try-On" on Defendant's Website (Dkt. 18-3, at 2.)*

The text below the "I Consent" box reads: "By using 'Try It On,' I understand that L'Oreal may process my image. To learn about your choices, visit the L'Oreal Privacy Policy." This notification does not solicit a user's assent to *any* specific terms; instead, it solicits assent to "processing" their image and states that the user can "learn about [their] choices" by viewing the Privacy Policy. Even if this were sufficient to manifest consent to the terms of the privacy policy (it is not), the Privacy Policy does not contain any mention of arbitration or even any link to the Terms of Use. (*See* Dkt. 18-4 (Privacy Policy).) Defendant contends the Privacy Policy "hyperlinks to the Terms of Use" (Dkt. 18, at 11), but the page only links to the Terms of Use in the same browsewrap format discussed above – that is, at the bottom of the page, in tiny text, and along with 23 other links (*see* Dkt. 18-4, at 15 (last page of Privacy Policy)). As discussed above, this format does not provide reasonable notice to a consumer such as Plaintiff and cannot be said to have assented.

## 2. The one-sided arbitration provision in the Terms of Use is unenforceable.

Even if Plaintiff *had* assented to Defendant's Terms of Use (she did not), the arbitration provision is unenforceable because it is entirely one-sided in favor of Defendant. The purported agreement states that "[b]y using this Site, you agree that L'Oreal USA or one of its affiliates *at is sole discretion*, *may* require" that disputes be resolved through arbitration on an individual basis. (Dkt. No. 18-9 (Terms of Use), at 11.) Under New York law, this is an unconscionable provision that cannot be enforced.[5]

"A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made – i..e, some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Anonymous v. JP Morgan & Chase Co.*, No. 05-cv-2442-JGK, 2005 WL 2861589, at *6 (S.D.N.Y. Oct. 31, 2005). As to procedural unconscionability, for all of the reasons set forth above, Plaintiff lacked any meaningful choice when Defendant buried its arbitration provision in a link, in tiny type, at the bottom of its webpage. *See Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 11 (1988) ("[t]he procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice"). As to substantive unconscionability, the touchstone is "whether one or more key terms are unreasonably favorable to one party." *Sablosky v. Edward S. Gordon Co.,* 73 N.Y.2d 133, 138, (1989). Courts regularly consider

---

[5] While Defendant concedes that this Court must determine whether an a written agreement existed between the parties (Dkt. 18, at 12-13), Defendant appears to argue that, simply by mentioning AAA rules, the parties have "clear[ly] and unmistakab[ly]" delegated questions of arbitrability to an arbitrator (*id.* at 13). This argument fails for two reasons. First, the arbitration clause does not even mention the specific "AAA Commercial Arbitration Rules & Mediation Procedures" that Defendant relies on. Second, the only case Defendant cites in support of its argument is inapposite. *Zhan v. Hogan* notes that the delegation issue remains an open question in the Seventh Circuit. No. 4:18-cv-04126-SLD-JEH, 2018 WL 9877970, *10 (C.D. Ill. Dec. 18, 2018). The question remains open, and other courts in this circuit repudiate Defendant's position. *See, e.g., Masco Corp. v. Prostyakov*, No. 09-cv-0500-RLY-TAB, 2009 WL 3390490, *4 (S.D. Ind. Oct. 19, 2009).

whether an arbitration agreement is one-sided in determining whether it is substantively unconscionable. *See, e.g., Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 404 (S.D.N.Y. 2021) (arbitration provision was *not* unconscionable because it was "mutual and two-sided"); *Carr v. Credit One Bank*, No. 15-cv-6663 (LAK), 2015 WL 9077314, at *3 (S.D.N.Y. Dec. 16, 2015) (arbitration clause was *not* substantively unconscionable because it was enforceable by either party); *Sanders v. Forex Cap. Markets, LLC*, No. 11 CIV. 0864 CM, 2011 WL 5980202, at *6 (S.D.N.Y. Nov. 29, 2011) (no unconscionability where "both parties were bound to resolve any dispute arising out of or related to Sanders' account by arbitration"). Allowing Defendant to determine whether any claim must be arbitrated, and whether it must be arbitrated on an individual basis or in accordance with AAA rules, unreasonably benefits Defendant. *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1001 (9th Cir. 2010) (a "paradigmatic" example of unconscionable one-sidedness is when a contract "[r]equir[es] one party to arbitrate its claims but not the other").

Defendant here wrote a one-way arbitration agreement – giving it sole discretion to decide whether to enforce it as to any claims that may arise – then buried this agreement in a browsewrap agreement that it now seeks to enforce against Plaintiff. The purported agreement is unconscionable and this Court should find it unenforceable.

    **B.    Plaintiff has stated plausible BIPA claims.**

        **1.    Rule 8 requires only that a plaintiff state a claim that is plausible on its face.**

At the pleading stage, a "pleader's responsibility" is merely to "state a claim to relief that is plausible on its face." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must read the complaint in the light most favorable to the plaintiff, with all well pleaded allegations taken as true and all reasonable inferences construed in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). To survive, a plaintiff need "provide only enough

10

detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Id.* at 1083 (internal quotation marks and citation omitted).

### 2. Plaintiff's Complaint plausibly alleges that Defendant possessed, captured, and collected her facial geometry.

L'Oreal cursorily argues that the Complaint does not plausibly allege that Defendant "possessed" or "collected" Ms. Kukovec's biometric data. (Dkt. 18, at 19-20.) Specifically, L'Oreal argues that the Complaint contains only "conclusory" allegations of a BIPA claim with no supporting facts as to the who, how, or when. Wrong again.

L'Oreal ignores the vast majority of Ms. Kukovec's allegations, which explain the steps L'Oreal requires all consumers to take in order to use L'Oreal's VTO tool. (Compl. ¶ 15-16.) Plaintiff explains how L'Oreal's VTO tool works (*id.* ¶¶ 17-20), including by "capturing the facial geometry of users' photos" and using these facial geometry scans to "identify the shape and features of the user's face in order to accurately overlay the virtual makeup product onto the image provided." (*Id.* ¶ 19.) A "scan of . . . face geometry" is expressly protected under BIPA, 740 ILCS § 14/10, and such a scan is exactly what Plaintiff alleges Defendant performed. These factual allegations demonstrate that L'Oreal possessed, captured and collected her facial geometry – at the very least, while she used the tool.[6]

Nor is there any question that Plaintiff sufficiently alleges that L'Oreal *actively* collected the biometric data: the Complaint alleges that L'Oreal offered the VTO tool on its website, that consumers were required to give L'Oreal access to their images to use the VTO tool, and that L'Oreal uses it and the facial geometry it captures to market its products to consumers by displaying an accurate representation of what L'Oreal's products will look like on their faces. (*Id.* ¶¶ 13-15, 23.)

---

[6] Defedant claims that it is "inconsistent" for Ms. Kukovec to allege both that Defendant captured and collected her facial geomoetry *and* that she does not know whether L'Oreal still has it. (Dkt. 18, at 20.) Not so. Of course Ms. Kukovec does not know what L'Oreal did with her biometric information *after* she used the VTO tool – that is the basis of this lawsuit. L'Oreal's argument that Plaintiff's allegations "upon information and belief" are overly speculative fail for the same reason -- "allegations premised on information and belief are permissible [w]here the pleadings concern matters peculiarly within the knowledge of the defendants," *CZS Holdings LLC v. Kolbe*, No. 20-C-6886, 2021 WL 1837385, at *3 (N.D. Ill. May 7, 2021), and what L'Oreal did with the information it collected is exclusively within Defendant's knowledge.

11

As to "possession," the facts alleged by Plaintiff as to the operation of the VTO tool – including that it was based on the user's image, that the technology captured facial geometry, and that L'Oreal precisely overlaid makeup on consumer's images based on that facial geometry (*id.* ¶¶ 13-20) – give rise to the reasonable inference that L'Oreal possessed that biometric data while Ms. Kukovec used the tool. *See Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831, 840 (N.D. Ill. 2021) (a defendant who can "access the biometric data collected" is in "possession" of that data).

The allegations in the Complaint are comparable to *Powell v. Shiseido Americas Corp*, No. 21-cv-2295 (C.D. Ill. filed Nov. 30, 2021), in which the court recently denied Defendant's motion to dismiss raising similar arguments as Defendant raises here. *See* Order, dated Aug. 22, 2022 (Dkt. 18; attached hereto as Exhibit B.) *Powell* concerned a VTO technology similar to the technology at issue here. In that case, the court held that the plaintiff had plausibly alleged that the defendant actively captured and/or collected biometric identifiers where the plaintiff alleged that the defendant "procured" the VTO technology, placed it on its website, and directed users to the application, and that a "[face geometry] map" was created through the tool on the website." *Id.* at 12. Plaintiff's allegations here are practically identical: L'Oreal offers the VTO tool on its websites, directs users to the VTO tool, and its websites create a facial geometry pattern. (Compl. ¶¶ 15, 20.) To the extent any individual paragraphs are conclusory, it is "because they are conclusions drawn from the preceding factual allegations." *Powell* at 8. Because Plaintiff has provided ample factual basis to support her allegations, this Court, like the court in *Powell*, should deny Defendant's motion to dismiss.

### 3. L'Oreal's privacy policy does not satisfy BIPA.

Moreover, L'Oreal's privacy policy falls far short of BIPA's specific disclosure and consent requirements. Section 15(a) of BIPA requires a "written policy, made available to the public" that "establish[es] a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied." 740 ILCS 14/15(a). L'Oreal's privacy policy does not contain or even reference any such policy.

First, the policy does not mention the terms biometric information or biometric identifiers, or even the word "biometric," *at all*. Because it does not specifically articulate or disclose a policy concerning the retention and destruction of *biometrics*, the policy violates Sect. 15(a) on that basis alone.

Second, the policy does not contain a retention schedule: its language provides only that information will be retained as long as a user's account is active "or as needed to provide services." (Dkt. 18-4 (Privacy Policy), at 10.) This vague language lacks any meaningful information about how long L'Oreal will retain Plaintiff's information, particularly because Plaintiff did not create a user account. Nor does it inform consumers of the "specific purpose and length of time" for which their biometric information is collected. Furthermore, the policy contains no guidelines on destruction. Instead, the language is both vague and contradictory, rendering it unintelligible. L'Oreal points to language stating that it "*may* delete certain records that contain Personal Information." (*Id.* (emphasis added).) However, this language is followed two sentences later by a statement that "it is not always possible to completely remove or delete all your information from our databases." *Id.* Put simply, L'Oreal's privacy "policy" is no cognizable policy at all.

As for Section 15(b), BIPA specifically requires that a company provide the user with written notice that their "biometric information or biometric identifier is being collected or stored" and "the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used." 740 ILCS 14/15(b)(1)-(2). L'Oreal's policy, however, only generally explains that it may "collect and store [a user's] *image*," but it does not specifically inform users that it may collect *biometric information or identifiers* specifically. (Dkt. 18-4, at 6 (emphases added).) Indeed, an image itself is not a qualifying biometric under BIPA. 740 ILCS § 14/10 ("Biometric identifiers do not include . . . photographs . . . ."). But when facial geometry is extracted from an image, BIPA applies. *Id.* (BIPA protects a "scan of . . . face geometry"). And again, its privacy policy is silent as to BIPA or the term "biometric." Thus, L'Oreal's privacy policy misleads consumers by claiming that it collects and stores only information that falls outside BIPA while simultaneously omitting that it also captures, collects, and stores a BIPA-protected biometric identifier. Further, the privacy policy also lacks a "specific purpose and length of time" that the biometric information is being "collected, stored,

13

and used" by Defendant. Finally, as these disclosures are insufficient, Plaintiff cannot be said to have executed a written release as required by Section 15(b)(3), either.

Simply put, Defendant's Privacy Policy does not conform to BIPA's requirements, and Defendant's far-fetched mischaracterizations of its privacy policy do not save it.

### 4. L'Oreal conflates standing with the requirements of class certification.

L'Oreal makes, in passing, the misguided argument that Plaintiff cannot plead a "legally plausible claim" based on sites she did not visit, and therefore could not have been "aggrieved" by Defendant's BIPA violations on those sites. (Dkt. 18, at 19.) Defendant does not explain this argument; Defendant raises this argument in the terms of rule 12(b)(6), then cites in support a case about standing, then moves on. To the extent Defendant purports to challenge standing, Defendant conflates standing with the scope of the class proposed in the Complaint. Such a challenge should be addressed under Rule 23 at class certification – not under Article III.

The Seventh Circuit has repeatedly warned against "conflating the standing inquiry with the inquiry under Rule 23 about the suitability of a plaintiff to serve as a class representative." *Payton v. Cty. of Kane*, 308 F.3d 673, 677 (7th Cir. 2002). That court's decision in *Arreola v. Godinez* is instructive. In that case, a district court had concluded that the named plaintiff "lacked standing to pursue injunctive relief" on behalf of proposed class members – some of whom were current inmates at a jail alleged to be engaging in unlawful conduct – because he was no longer housed at the jail. 546 F.3d 788, 795 (7th Cir. 2008). The appeals court held that the district court improperly analyzed the issue because the problem was "not one of standing." *Id.* The named plaintiff satisfied Article III's requirements because he showed a concrete injury that was traceable to the jail's conduct and redressable by a favorable judgment. *Id.* He therefore satisfied the prerequisite requirement of filing suit, so the standing inquiry ended and the focus shifted to whether he satisfied Rule 23's requirements. *See id.* at 799 (analyzing whether the named plaintiff could seek injunctive relief on behalf of current inmates under Rule 23(a)'s adequacy requirement).

Here, Plaintiff's allegations concerning her use of the L'Oreal Paris website and L'Oreal's unconsented use of her facial geometry satisfy the Article III "prerequisite to filing suit," *Arreola*, 546

14

F.3d at 795 (emphasis omitted), and the standing inquiry is done. *See Powell*, Ex. B, at 15 ("To be sure, Defendant has identified a difference between Plaintiff and others in the class he seeks to represent. Plaintiff would have suffered his injury while visiting Defendant's bareminerals.com website, while others in the class would have suffered their injuries at websites never even visited by Plaintiff. Still, the injuries suffered by the class members, including Plaintiff, would otherwise be remarkably similar. Namely, all would have had their facial geometry captured by Defendant while utilizing the VTO feature at one of Defendant's websites.").

L'Oreal's arguments concerning the scope of the class should be addressed at class certification, not on the pleadings. See 1 Newberg on Class Actions § 2:6 (5th ed. 2021) ("[W]hen a class plaintiff shows individual standing, the court should proceed to Rule 23 criteria to determine whether, and to what extent, the plaintiff may serve in a representative capacity on behalf of the class."); *Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 409 (N.D. Ill. 2021) ("Caterpillar's arguments about the mismatch between the named plaintiffs' alleged injuries and those of the class members raise Rule 23 issues that logically precede Article III standing."). The Court should therefore reject L'Oreal's effort "to inject class certification issues into the standing inquiry." *Caterpillar*, 522 F. Supp. 3d at 409.

### C. In the alternative, the Court should grant leave to amend if it finds any deficiencies in Plaintiff's allegations.

This Court should deny Defendant's motion in full. In the alternative, though, if the Court grants L'Oreal's Motion to Dismiss in any respect, it should grant Plaintiff leave to file an amended complaint. "Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004). "Cases of clear futility at the outset of a case are rare." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015), and this is not such a case.

### CONCLUSION

For the foregoing reasons, the Court should deny L'Oreal's Motion to Dismiss.

Case: 1:22-cv-03829 Document #: 28 Filed: 10/17/22 Page 16 of 17 PageID #:196

Dated: October 17, 2022

Respectfully submitted,

By: /s/ *Hassan A. Zavareei*
Hassan A. Zavareei, Esq. (456161)
*hzavareei@tzlegal.com*
Glenn E. Chappell, Esq.*
*gchappell@tzlegal.com*
Allison W. Parr, Esq.*
*aparr@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, DC 20036
Tel. No.: (202) 973-0900
Fax No.: (202) 973-0950

Elizabeth C. Chavez, Esq. (6323726)
*ecc@fmcolaw.com*
Peter L. Currie, Esq. (6281711)
*plc@fmcolaw.com*
Bret K. Pufahl, Esq. (6325814)
*bkp@fmcolaw.com*
Kathleen C. Chavez, Esq. (6255735)
*kcc@fmcolaw.com*
Robert Foote, Esq. (3124325)
*rmf@fmcolaw.com*
**FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC**
10 W. State Street, Suite 200
Geneva, IL 60134
Tel. No.: (630) 232-7450
Fax No.: (630) 232-7452

COUNSEL FOR THE PLAINTIFF AND THE PUTATIVE CLASS

\**admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I, Hassan A. Zavareei, an attorney, hereby certify that on October 17, 2022, I caused the foregoing **RESPONSE TO DEFENDANT'S MOTION TO DISMISS** to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered parties.

                                                                 _/s/ Hassan A. Zavareei_
                                                                 Hassan A. Zavareei